UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| JACK R WADSWORTH, JR., | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | No. 2:18-cv-00310-JRS-MJD |
| JACKIE L. WEST-DENNING, Dr., Provider/Physician, | ) ) ) ) | |
| Defendant. | ) | |

**Order Granting Defendant's Motion for Summary Judgment
and Directing Entry of Final Judgment**

Plaintiff Jack R. Wadsworth, Jr., is an inmate in the Indiana Department of Correction who brought this 42 U.S.C. § 1983 action on July 7, 2018, asserting that defendant Dr. Jackie L. West-Denning was deliberately indifferent to his serious medical needs while he was incarcerated at the Wabash Valley Correctional Facility (WVCF). Dr. West-Denning has moved for summary judgment. Mr. Wadsworth has responded, and Dr. West-Denning has replied. For the reasons explained below, Dr. West-Denning's motion is **granted**.

**I. Summary Judgment Standard**

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ.

P. 56(e). Summary judgment is often described as the "put up or shut up" moment in a lawsuit. *Grant v. Tr. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017).

The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has repeatedly assured the district courts that they are not required to "scour every inch of the record" for evidence that is potentially relevant to the summary judgment motion before them. *Grant,* 870 F.3d at 573-74. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Anderson*, 477 U.S. at 255.

Mr. Wadsworth has responded to the motion for summary judgment, but he did not submit evidence or cite to portions of the evidentiary record to support his argument. Accordingly, the facts alleged in Dr. West-Denning's motion are deemed admitted so long as support for them exists in the record. *See* S.D. Ind. Local Rule 56-1 ("A party opposing a summary judgment motion must . . . file and serve a response brief and any evidence . . . that the party relies on to oppose the motion."); *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) ("[F]ailure to respond by the nonmovant as mandated by the local rules results in an admission"); *Brasic v. Heinemanns, Inc.*, 121 F.3d 281, 285-286 (7th Cir. 1997) (affirming grant of summary judgment where the nonmovant failed to properly offer evidence disputing the movant's version of the facts). This does

not alter the summary judgment standard, but it does "[r]educ[e] the pool" from which facts and inferences relative to the motion may be drawn. *Smith v. Severn*, 129 F.3d 419, 426 (7th Cir. 1997).

## II. Facts of the Case

Applying the standard just explained, the following statement of facts is not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and evidence are presented in the light reasonably most favorable to Mr. Wadsworth as the non-moving party. All reasonable inferences are also made in his favor.

Mr. Wadsworth injured his left shoulder while he was at the Indiana State Penitentiary. A physician there gave him Neurontin (a pain medication), and a cortisone injection, and then transferred him to the New Castle Correctional Facility for physical therapy. When physical therapists concluded they could no longer help Mr. Wadsworth, he was transferred to WVCF. Dkt. 1 at p. 4.

Dr. West-Denning was a physician providing medical care at WVCF from October 2017 to July 2018. Dkt. 30-1 at ¶ 2 (affidavit of Dr. West-Denning).

Dr. West-Denning first saw Mr. Wadsworth for his shoulder pain on January 3, 2018. *Id*. at ¶ 7; dkt. 30-2 (Mr. Wadsworth's medical records). Dr. West-Denning prescribed a low level of Neurontin for his pain.

Dr. West-Denning next treated Mr. Wadsworth for musculoskeletal pain on March 7, 2018. Dkt. 30-1 at ¶. They discussed Mr. Wadsworth's activities of daily living (ADLs), and Mr. Wadsworth indicated that he was performing his self-exercise plan twice daily. Dr. West-Denning, however, noted a disparity between Mr. Wadsworth's subjective complaints of pain and his outward appearance as well as her objective observations. *Id.*

One week later, on March 15, 2018, Dr. West-Denning saw Mr. Wadsworth again for shoulder pain. *Id.* at ¶ 9. Mr. Wadsworth complained that his hand and shoulder pain occurred after he had done a significant number of push-ups. *Id.* Because Mr. Wadsworth also reported itching from his pain medication Trileptal, Dr. West-Denning changed the pain medication to Keppra. Dr. West-Denning also noted that Mr. Wadsworth did not have an active allergy to Trileptal and had successfully taken it in the past. *Id.* Dr. West-Denning prescribed Keppra instead of a non-steroidal anti-inflammatory drug ("NSAID") because Mr. Wadsworth was also taking an anti-depressant medication. Negative interactions can occur when taking NSAIDs and anti-depressants simultaneously. *Id.* at ¶ 9.

Dr. West-Denning had also noted that Mr. Wadsworth was prescribed Neurontin for pain, but two consecutive low Neurontin levels had been reported after testing, an indication that Mr. Wadsworth may have "diverted" the drug rather than use it to treat his pain. *Id.* Dr. West-Denning thought Keppra to be a suitable alternative for Mr. Wadsworth because it is also an anti-epileptic effective for treating neuropathic pain and is less-trafficked than Neurontin in the prison environment. *Id.*

On April 19, 2018, Mr. Wadsworth saw Dr. West-Denning again for left shoulder pain and asked for an increase in his Keppra dosage. *Id.* at ¶ 12. Before increasing the dosage, Dr. West-Denning ordered laboratory tests to measure Mr. Wadsworth's kidney and liver function. *Id.*

Just five days later, on April 24, 2018, Dr. West-Denning saw Mr. Wadsworth again for his shoulder pain. *Id.* at ¶ 13. Mr. Wadsworth asked Dr. West-Denning for another increase in the Keppra dosage. *Id.* Dr. West-Denning told him that she had increased his dosage following the prior visit (just five days before), and she called the pharmacy to ensure that Mr. Wadsworth's

increased dosage of Keppra had been dispensed to him. After Dr. West-Denning placed this call, Mr. Wadsworth became agitated and left the exam room. *Id.*

Dr. West-Denning learned that during a mental health treatment session on May 16, 2018, Mr. Wadsworth told an extern that "I'm going to kill someone" in an effort to "get the death penalty." *Id.* at ¶ 14. A prison conduct report was issued for that threat. *Id.*

Mr. Wadsworth next saw Dr. West-Denning on May 22, 2018, when he complained about shoulder pain. *Id.* at ¶ 14. Mr. Wadsworth described his pain as a 15 on a 10-point scale, but despite that claim, Dr. West-Denning noted from Mr. Wadsworth's appearance that he seemed to be in no acute distress. *Id.* Mr. Wadsworth described his pain as "aching, burning, dull, piercing, sharp, throbbing, and treacherous," and said that the Keppra provided only partial relief of his shoulder pain. *Id.* He added that he had previously been given Meloxicam, Oxcarbazepine, Cymbalta, Nortriptyline, Tegretol, Ibuprofen, Naproxen, and Toradol, but he was not satisfied with the results of these medications. But Mr. Wadsworth also reported that he was able to perform his ADLs. *Id.*

Following a discussion of the risks and benefits of Keppra, Mr. Wadsworth agreed to take an increased dosage to attempt to manage his pain. *Id.* Following the visit, Dr. West-Denning ordered x-rays of Mr. Wadsworth's left shoulder to see if any injury could be detected. *Id.* at ¶ 16.

Their next meeting was on June 5, 2018, which was also for shoulder pain. *Id.* at ¶ 17. Mr. Wadsworth reported his pain level was 10, but Dr. West-Denning noted that it was difficult to truly assess Mr. Wadsworth's pain because he consistently reported the pain at 10. He did this despite objective findings from his outward manifestations during physical examinations that indicated otherwise. *Id.* Mr. Wadsworth complained that his shoulder pain was aggravated by movement, relieved by rest, and had gotten worse in the last six to eight months. He also reported that he was experiencing an increase in popping and crepitus. *Id.* Crepitus is a grating, crackling,

or popping sound produced by friction between either bone and cartilage or the fracture components of a bone. Crepitus is also called "creaky joints." *Id.* at ¶ 18. But Mr. Wadsworth reported that he was able to perform his ADLs, and Dr. West-Denning was unable to detect ligamentous laxity (loose ligaments causing chronic pain) during her examination of the left shoulder. *Id.* at ¶ 17. Mr. Wadsworth requested a sling, an MRI, and shoulder surgery. *Id.* Dr. West-Denning noted that she had increased Mr. Wadsworth's Keppra dosage just two weeks prior to this visit. *Id.* After the visit, Dr. West-Denning submitted a consultation request for assistance in obtaining Mr. Wadsworth an off-site MRI. *Id.* at ¶ 19.

The next day, June 6, 2018, Mr. Wadsworth sought medical treatment for a new injury he had sustained in an incident with a custody officer. *Id.* at ¶ 20. Mr. Wadsworth told Dr. West-Denning that his left shoulder was dislocated. *Id.* Before x-rays were taken, Dr. West-Denning tried to physically assess Mr. Wadsworth to test his range of motion. *Id.*; dkt. 32 (Mr. Wadsworth's response) at p. 5. Mr. Wadsworth refused passive range of motion testing. Dkt. 30-1 at ¶ 20. Based on her objective findings, Dr. West-Denning did not believe that Mr. Wadsworth's shoulder was dislocated. *Id.* Because Mr. Wadsworth insisted his shoulder was dislocated, Dr. West-Denning attempted to "reduce" his shoulder (pushing the joint's humerus ball into its socket) but was unable to move it in any direction. *Id.* Reducing a dislocation is a procedure that necessarily involves pain because pressure must be applied to the injured joint. *Id.* at ¶ 21; dkt. 30-3 (affidavit of Dr. Samuel Byrd) at ¶ 6. The reduction attempt lasted "maybe a minute, tops." Dkt. 30-5 (Mr. Wadsworth's deposition) at p. 71. After consulting with Dr. Byrd and Health Services Administrator Kim Hobson, Dr. West-Denning ordered an x-ray of Mr. Wadsworth's left shoulder to definitively rule out a dislocation. Dkt. 30-1 at ¶ 20. Mr. Wadsworth was given two acetaminophen tablets for pain. Dkt. 30-5 at pp. 72-73.

On June 19, 2018, the last time she ever met with Mr. Wadsworth, Dr. West-Denning had to inform him that her request for an off-site MRI had been denied because of the write-up Mr. Wadsworth received for his threat to kill somebody. *Id.* Mr. Wadsworth became agitated, talked over her, raised his voice, stated he no longer wanted to take Keppra, and denied all offers of other pain medication. *Id.* He believed Dr. West-Denning was being rude and hostile toward him. Dkt. 32 at p. 6. Mr. Wadsworth also asked Dr. West-Denning how he could bring a lawsuit against her. Dkt. 30-1 at ¶ 20. Due to Mr. Wadsworth's hostility toward her, Dr. West-Denning did not feel safe conducting a physical examination of Mr. Wadsworth's shoulder. *Id.* She did, however, write orders for Mr. Wadsworth to be tapered off Keppra. *Id.*

The next day, June 20, 2018, at a mental health session with the same extern from the prior mental health session, Mr. Wadsworth said that Dr. West-Denning's request for him to receive an off-site MRI was denied because of the conduct report. *Id.* Mr. Wadsworth also told the extern that he was not allowed to take trips or get a sling due to custody staff's safety and security concerns because of his recent threats. *Id.*

During all his visits with Dr. West-Denning, Mr. Wadsworth believes that he was told that his shoulder pain was due to arthritis. Dkt. 32 at p. 4.

In June 2019, Mr. Wadsworth's primary physician was Dr. Samuel Byrd. Dkt. 30-3. Dr. Byrd noted that Mr. Wadsworth was then taking Trileptal, without complaint, for his shoulder pain. *Id.* at ¶ 8. Mr. Wadsworth states that Dr. Byrd has given him a cortisone injection, a bottom bunk pass, a cuff-in-front order, an arm sling, and acknowledges that his pain is more than arthritis. Dkt. 32 at p. 6.

## III. Analysis

Mr. Wadsworth's § 1983 claims against Dr. West-Denning for deliberate indifference to his serious medical needs arise, because he is a convicted offender, under the Eighth Amendment. *See Helling v. McKinney*, 509 U.S. 25, 31 (1993) ("It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.").

Prison officials have a duty to provide humane conditions of confinement, which includes *adequate* medical care. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). To prevail on a deliberate indifference to serious medical needs claim, Mr. Wadsworth must show that (1) he suffered from an objectively serious medical condition, and (2) the defendant knew about the condition and the substantial risk of harm it posed but disregarded that risk. *Id.* at 837; *Pittman ex rel. Hamilton v. County of Madison*, 746 F.3d 766, 775 (7th Cir. 2014); *see also Petties v. Carter*, 836 F.3d 722, 727–28 (7th Cir. 2016) (*en banc*) ("To determine if the Eighth Amendment has been violated in the prison medical context, [courts] perform a two-step analysis, first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual defendant was deliberately indifferent to that condition."). To elaborate further:

> To prove deliberate indifference, mere negligence is not enough. A plaintiff must provide evidence that an official actually knew of and disregarded a substantial risk of harm. The linchpin is a lack of professional judgment. A medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have so responded under those circumstances. A prison medical professional faces liability only if his course of treatment is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment.

*Campbell v. Kallas*, 936 F.3d 536, 544-45 (7th Cir. 2019) (internal citations and quotations omitted). To elaborate even more, deliberate indifference means a culpable state of mind equivalent to criminal recklessness. *Rivera v. Gupta*, 836 F.3d 839, 842 (7th Cir. 2016).

Mr. Wadsworth argues in opposition to summary judgment that his statement of disputed facts shows a genuine issue exists concerning the second, or subjective, showing he must make to establish deliberate indifference. Dkt. 32 at p. 9. The Court disagrees. Not only are the factual statements offered by Mr. Wadsworth insufficient to suggest that Dr. West-Denning knew of his serious medical needs and deliberately did nothing about them knowing they posed a great risk to him, his assertions are unsworn and do not constitute evidence. But even if they did, assuming as true that Dr. West-Denning repeatedly told Mr. Wadsworth his condition was arthritis, that she was rude and hostile to him, and that she caused him pain when she attempted to reduce his shoulder dislocation, none of this suggests that Dr. West-Denning deliberately chose to do nothing about his pain or otherwise treat him.

At each of his visits with Dr. West-Denning, Mr. Wadsworth's pain medication was assessed and often adjusted with increases. Dr. West-Denning ordered x-rays, conducted visual examinations, assessed Mr. Wadsworth's complaints of pain, and took steps to get him an MRI. Mr. Wadsworth reported that he could complete all of his ADLs. These activities do not suggest deliberate indifference, but the opposite. The evidence shows that Dr. West-Denning was attentive to Mr. Wadsworth's condition and worked to alleviate it. A medical provider's treatment need not be a "perfect action or even [a] reasonable action . . . [The] action must be reckless before § 1983 liability can be found." *Cavalieri v. Shepard*, 321 F.3d 616, 622 (7th Cir. 2003).

In his complaint, Mr. Wadsworth asserted three reasons why Dr. West-Denning should be liable. First, he asserted that Dr. West-Denning used "unsafe technical skills" and "inappropriate

9

interpersonal behaviors" when she provided medical care. Dkt. 1 at p. 3. He cited to Indiana law for this contention, but if Indiana law was applicable to the federal claim, there is no argument or evidence to explain why. The summary judgment record, furthermore, contains no evidence that Dr. West-Denning employed unsafe technical skills. Construing this assertion to apply to Dr. West-Denning's treatment of Mr. Wadsworth's dislocated shoulder, there is no showing of unsafe technical skills. The reduction of a dislocated joint is necessarily painful, as Dr. West-Denning and Dr. Byrd testify, *see* dkt. 30-1 at ¶ 21; dkt. 30-3 at ¶ 6, but it is not unsafe. And if Dr. West-Denning had a rude bedside manner, that alone does not create § 1983 liability.

Mr. Wadsworth's second reason for imposing liability on Dr. West-Denning was that she was "abandoning or knowingly neglecting patients/clients requiring medical care." Dkt. 1 at p. 3. But there is no evidence to suggest that she did. To the contrary, the evidence is that Dr. West-Denning saw Mr. Wadsworth nine times in a tenth-month period and responded to his concerns each time. Mr. Wadsworth's assertion of deliberate indifference is without merit.

The third reason Mr. Wadsworth claimed that Dr. West-Denning should be liable to him concerns her treatment of his suspected shoulder dislocation. *Id.* The Court discussed this matter above and found that it does not suggest deliberate indifference. Mr. Wadsworth's third reason is also without merit.

Because there is no evidence to suggest that Dr. West-Denning was deliberately indifferent to Mr. Wadsworth's serious medical needs, and with the summary judgment record demonstrating that she was not deliberately indifferent, Dr. West-Denning's motion for summary judgment is granted.

## IV. Conclusion

For the reasons set forth in this Order, defendant Dr. Jackie West-Denning's June 3, 2019, motion for summary judgment, dkt. [28], is **granted**. This case is **dismissed** with prejudice. Final judgment consistent with the screening Order of July 23, 2018, and this Order shall now enter.

**IT IS SO ORDERED**.

Date: 3/17/2020

_____
JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Jack R Wadsworth, Jr.
954819
Miami Correctional Facility
Electronic Service Participant – Court Only

Douglass R. Bitner
Katz Korin Cunningham, P.C.
dbitner@kkclegal.com

Jarod Zimmerman
Katz Korin Cunningham, P.C.
jzimmerman@kkclegal.com